## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

IN RE

DAVID B. BRUNELL,
JENNIFER GAIL BRUNELL,

CHAPTER 7
CASE NO. 04-17792-WCH

DEBTORS.

JENNIFER GAIL BRUNELL,

PLAINTIFF,

vs.

CITIBANK (SOUTH DAKOTA) N.A.,
EDUCATIONAL CREDIT MANAGEMENT
CORPORATION and CHEMICAL BANK
EDUCATIONAL FINANCIAL GROUP,

ADVERSARY PROCEEDING
NO. 04-01435

DEFENDANTS.

## MEMORANDUM OF DECISION

## I. Introduction

In her Chapter 7 bankruptcy case, plaintiff Jennifer Gail Brunell ("Debtor") filed an

adversary complaint ("Complaint") seeking the discharge of her educational loans under 11

U.S.C. § 523(a)(8). Educational Credit Management Corporation ("ECMC") filed a motion to

intervene in this matter and I allowed ECMC to substitute as defendant for Wells Fargo

Education Financial Services and Sallie Mae Servicing Corporation, and answer the Complaint.[1]

---

[1] I allowed the original Complaint to be amended to correct an original party defendant
and add two additional party defendants. Several of these defendants, Citibank (South Dakota)
N.A., Chemical Bank Educational Financial Group and Sallie Mae Servicing Corporation, did

1

Following discovery, and the submission of pre-trial briefs and a Joint Pre-Trial Memorandum

("*JPTM*"), I held a trial on September 27, 2006. At trial, the Debtor and Becky Comery, a former

co-worker of the Debtor in her current industry, testified and thirteen (13) exhibits were

submitted into evidence without objection. ECMC presented no witnesses and three (3) exhibits

were received into evidence. The issue presented is whether the Debtor met her burden of

establishing that the repayment of her student loans would constitute an undue hardship on her.

The following constitute my findings of fact and conclusions of law pursuant to Fed. R. Bankr. P.

7052.

## II. Facts

### A.    Debtor's Background and Current Income

The Debtor filed a voluntary case under Chapter 7 of the Bankruptcy Code with her

former husband on September 23, 2004 ("filing date"). *JPTM* 4. They received a general

discharge for all the eligible debts scheduled in their bankruptcy petition on February 25, 2005,

which would not have included the student loan obligations for which she now seeks discharge

pursuant to the Complaint. *JPTM* 4. The Debtor is forty-one (41) years old and currently a

resident of Tiverton, Rhode Island.[2] *Trial Transcript ("Tr.")* 5-6. She is divorced and has

custody of her three children, a daughter age seven (7) and twin daughters age five (5). *JPTM* 4;

*Tr.* 7. The parties stipulated that the Debtor's health is good and that her assets are minimal.

---

not respond to the Complaint and default judgments were entered against each. The default
judgment entered in this matter against Sallie Mae Servicing Corporation apparently is separate
from the interest of Wells Fargo Education Financial Services, the former holder of the loan that
is the subject of this Complaint.

[2]The Debtor had resided in Plainville, Massachusetts as of the filing date.

*JPTM* at 5.  She is intelligent and well-educated, and has been gainfully and continuously employed in the health services industry since August 2004.

For her education, she believes she borrowed approximately $16,000 for her bachelor's degree, $35,000 for her master's degree, and $45,000 to $50,000 for her Ph.D program.  *Tr.* 16, 23.  During this proceeding, the parties stipulated that Debtor is indebted to ECMC, a student loan guarantor agency and the current holder of amounts due under the Debtor's various student loan obligations ("student loan").  *JPTM* 4-5.  The parties also stipulated that as of September 19, 2006, the amount due on the student loan totaled $200,245.77, with a per diem of $33.46.  *JPTM* 4; *see also ECMC's statement of amount owed by the Debtor on the student loan*, Def.'s Ex. 1.[3] Over 30 years, payments of at least $1,298.79 monthly would be required to repay this debt.  *Id.*

The Debtor's substantial obligations under the student loan arose in connection with her undergraduate studies from 1983 through 1987, and graduate studies from 1993 through 2001. She obtained her bachelor's degree in electrical engineering from Worcester Polytechnic Institute in 1987.  *Tr.* 18.  While she was in college, she funded her education with scholarships, student loans and funds from a part-time job, reflecting her intelligence and resourcefulness.  *Response of Plaintiff to First Set of Interrogatories Submitted by Educational Management Corporation ("Interrogatory Answers")*, Pl.'s Ex. 7 at 9.

The Debtor's career in the engineering field prior to her current career was just as promising as her current career in the health services industry.  In the summer after she graduated from college, she worked as a systems engineer with Teledyne Brown Engineering where she

---

[3]By agreement with ECMC, the Debtor reserved the right to contest any other issue concerning the student loan, aside from dischargeability, with respect to any whole or part of the student loan that may not be excepted to discharge.  *Id.*

3

worked on building large computer systems for the government, and earned a salary of approximately $30,000 annually. *Tr.* 51-52. After that office was closed, she was able to immediately find another job with Mitre Corporation for a similar position and salary. *Tr.* 52-53. Within only sixteen months or so after starting the position at Mitre, she was able to advance to an even higher paying job at GTE Corporation in systems engineering, where she started at a salary of $33,000 annually and worked for the following five years. *Tr.* 53. During this time between 1990 and 1992, she also attended single classes at Northeastern University and Middlesex Community College which she paid for with funds from her full-time employment. *Interrogatory Answers*, Pl.'s Ex. 7, at 9.

After deciding to pursue her interest in psychology, between 1993 and 2001, the Debtor returned to full-time graduate study. In 1993, she commenced a master's program in counseling psychology at Lesley College, a degree which she completed in 1995. *Tr.* 14-15. Within a year of completing her master's degree, the Debtor applied to Ph.D. programs. *Tr.* 16, 18. She subsequently commenced a Ph.D. program and did work towards her doctorate at Suffolk University and the Fielding Institute between 1996 and 2001. *Tr.* 15. She paid for the cost of her master's and Ph.D. programs with student loans and support from her husband. *Interrogatory Answers*, Pl.'s Ex. 7, at 10. It had been her intention to earn her master's and Ph.D. in order to be able to change fields, and that her husband would support the family while she worked to pay back her student loans. *Tr.* 38.

After her first daughter was born in 1998, the Debtor continued as a full-time Ph.D. student. *Tr.* 18. She dropped out of her Ph.D. program in February 2001, four months before her twins were born. *Id.* She and her husband separated, and her husband filed for divorce in 2003.

4

*Tr.* 38.   The divorce judgment indicates that they separated in June 2003, and the divorce became final in August 2005 after a little over seventeen (17) years of marriage.   *Judgment of Divorce Nisi and Separation Agreement,* Pl.'s Ex. 12.

In August 2004, the Debtor started her employment at the Attleboro Center - Community Care Services ("Attleboro Center").   *Tr.* 19.   At the Attleboro Center, the Debtor worked with adolescents aged 12 through 18 during their residence at an inpatient treatment center, as a clinician.   *Interrogatory Answers*, Pl.'s Ex. 7, at 3-4.   Her duties included the treatment of individuals, families and groups, crisis intervention, case management and aftercare services.   *Id.* at 4.   The parties stipulated in the *JPTM* that her hourly pay at the Attleboro Center was $16.50 for 40 hours, but the Debtor testified that her compensation was actually the amount of approximately $37,000 gross per year, which would indicate an approximate hourly rate of $17.79 (($37,000 ÷ 52) ÷ 40 = $17.788), and in her answers to ECMC stated that she was paid hourly at a rate of $17.89, amounts slightly higher than the $16.50 per hour indicated in the stipulated facts. *JPTM* 4; *Tr.* 6; *Interrogatory Answers,* Pl.'s Ex. 7 at 4.   She worked for the Attleboro Center from August 2004 to July 2005.   *Id.* at 3.

From August 2005 to November 2005, the Debtor was employed with South Bay Mental Health Services as a fee-for-service staff therapist.   *Id.*   At this job, she also provided individual and family counseling to a wide variety of clients and managed caseloads.   *Id.*   She earned $30.00 per contact hour at this position, but left this position when she obtained her current employment which provided hourly compensation.   *Id.*

The Debtor has been employed since November 2005 with Associates for Human Services Incorporated - Early Intervention Program, in Taunton, Massachusetts ("Associates"),

5

where she is currently employed as a service coordinator and counselor. *Id.* In this position, she manages caseloads of families with children up to 3 years of age with developmental delays. *Id.* When she started her position, she was paid the amount of $35,000 annually, or the amount of $16.8269 hourly. *Tr.* 38; *Letter from Program Director to Jennifer Brunell* dated November 1, 2005 *and various paystubs from January through April 2006*, Pl.'s Ex. 8. Her compensation at this position also includes a mileage and gas reimbursement. *Tr.* 41. As of September 2, 2006, her year-to-date net pay, including the mileage and gas reimbursement, was demonstrated to be $22,531.80. *Copy of year-to-date earning statement*, Pl.'s Ex. 2; *Tr.* 60-61. The copy of a letter dated September 12, 2006 provides information regarding the Debtor's salary since that date. *Letter from Program Director of Associates for Human Services*, Pl.'s Ex. 13. The letter states that the Debtor's current salary is $17.50 per hour. *Id.*

In addition to the Debtor's higher salary, the letter from employer also indicates that the Debtor's pay is subject to annual increases, and that salaries within their organization have been adjusted upwards by a factor of 1.5% to 4% annually over the past four years, depending upon the state's budget for their organization. *Id.* The letter also states that salaries in their organization are 25-35% lower than that for individuals in hospital or school settings. *Id.*

In her present industry, for someone with her educational background, the Debtor testified to know the salary range to be in the teens up to approximately $38,000. *Tr.* 38-39. To be able to work in a setting with a higher pay, such as a hospital, she would need to earn her License Mental Health Counselor (LMHC) certification, which would require an exam and certain experience over two years. *Tr.* 43-44. But she testified that she believed she could not afford to go back to school or enter a training certification process due to the time and cost involved. *Tr.*

6

38-40, 65. She testified that she likes her current job. *Tr.* 68. She has not applied for second

jobs because she believes she cannot work any more hours than she currently does. *Tr.* 68-69.

In addition to the income from her current employment, the divorce judgment with her

ex-spouse requires payment of child support to the Debtor in the amount of $176 per week, and

the submission of a percentage of additional amounts for any commissions or bonuses that her

ex-husband may receive. *Judgment of Divorce Nisi and Separation Agreement,* Pl.'s Ex. 12.

The parties stipulated that she receives $704 per month in child support for all three children,

which is attached by the Massachusetts Department of Revenue from her ex-husband's pay. *Tr.*

29; *Custodial Parent Notice of Support Collections from Commonwealth of Massachusetts,* Pl.'s

Ex. 8.   The Debtor testified that she knows her ex-husband's employment history to be "poor,"

and that continued child support income may not be reliable. *Tr.* 31.  She testified that she

receives no other parental or family monetary assistance, and expects no inheritance. *Tr.* 25-26.

The Debtor testified that she has received around $4,000 to $5,000 each year for her tax

refund since 2003. *Tr.* 23-24.  Her tax return for 2003 indicates that she actually received a joint

refund with her husband for $1,070 for that year.[4]  *Copies of federal tax returns for 2003 through*

*2005,* Pl.'s Ex. 3.  For 2004, her return indicates that she received a refund of $4,918 for that

year. *Id.*  For 2005, her return indicates that she received a refund of $4,284. *Id.*  She also

indicated that she has received food stamps, cash assistance and other benefits in the past two

years, but testified that she was no longer receiving such benefits because she works full-time.

*Interrogatory Answers,* Pl.'s Ex. 7 at 8; *Tr.* 42-43.

-------------------

[4]The amount reflected as received for the joint 2003 tax refund is different from the $768
she listed in her interrogatory responses to ECMC. *Interrogatory Answers,* Pl.'s Ex. 7 at 8.

B.    Debtor's Current Liabilities and Expenses

In addition to the student loan, the Debtor submitted various bills and collection notices

due since the filing of the bankruptcy. *Various bills and collection notices,* Pl.'s Ex. 8;

*Interrogatory Answers*, Pl.'s Ex. 7 at 7.  In her interrogatory responses to ECMC in April 2006,

the Debtor indicated that these approximate amounts included: a loan of $4,000 from a friend for

a retainer for a divorce lawyer, $2,000 to her former landlord,[5] unpaid utility bills of less than

$2,000, amounts owed for previous child care of $1,500 and minor medical bills of less than

$500. *Interrogatory Answers*, Pl.'s Ex. 7 at 7, 11.  At trial, the Debtor testified that she owed

$200-$300 to her divorce lawyer, $180 to her previous cable company and $365 to New England

Gas. She also stated that she owes her current cable company $200-$360 and that her cable was

pending shut-off. *Tr.* 32-33.  She testified that she could not remember other bills that she had

even though she knew that she had them. *Tr.* 32.  She also explained that she had to pay over

$300 to her ex-husband to save the greater expense of going to court over the cost of past

medical insurance premiums. *Tr.* 28-29.

Her vehicle is a 1995 Mercury Villager purchased for $4,000 about a year and a half ago

using her tax refund for that year. *JPTM* 5; *Tr.* 8-9, 24.  The vehicle has about 120,000 miles on

it, and its general condition is "not too great," but the Debtor currently needs to drive her car 200

to 250 miles per week for her current employment. *Tr.* 47.  She testified that she would use her

next tax refund for repairs to her car. *Tr.* 46.  The Debtor also has a checking account with an

associated savings account at Citizens Bank. As of the date of the trial, she testified that the

---

[5]The Debtor testified that she was evicted from her former apartment in Plainville,
Massachusetts, and she believed to owe the amount of $1,900 to $2,000 in back rent to her
former landlord. *Tr.* 12, 31.

8

balance in her savings account was $10, and the balance in the checking account was $1,000. *Tr.* 13-14. She has no retirement savings and is unable to afford such plans that are offered through work. *Tr.* 26.

The Debtor has provided several different tabulations of her claimed average monthly expenses over the course of this proceeding. These amounts are summarized in the following chart, as she indicated them to be at three points in time - as of December 2004, Pl.'s Ex. 4; as of April 2006, *Interrogatory Answers*, Pl.'s Ex. 7 at 12; and as of August 2006, Pl.'s Ex. 5:

|  | August 2006 | April 2006 | December 2004 |
|---|---|---|---|
| Rent | $850[6] | $850 | $1204 |
| Gas | *no amount provided* | *no amount provided* | $21.98 |
| Electric | *no amount provided* | $50 | $41.85 |
| Cable, internet, phone | $151.24 | $60 telephone | $112.64 cable |
|  |  |  | $43.98 telephone |
| AOL ISP | $24.95 | *no amount provided* | $24.95 |
| Cell phone | $54.31 | *no amount provided* | $54.31 |
| Storage unit | *no amount provided* | *no amount provided* | $84.60 |
| Gas for car | $450 | $303 | $82.90 |
| Repairs for car | *no amount provided* | $50 |  |
| Clothing | $125 | $165 | $124.11 |
| Groceries | $600 | $175 | $451.92 |
| Medical - Doctors | $25 | $125 | $84 |
| Medical - Prescriptions | $20 | *no amount provided* | $52.62 |
| RiteCare premiums | $61 | *no amount provided* | *no amount provided* |

---

[6]Her lease agreement indicates that this amount includes heat, hot water, sewer, trash and lawn care. The lease reflects that it covers the period of February 1, 2006 through February 1, 2007, and a security deposit of $850 was paid. *Lease Agreement,* Pl.'s Ex. 11.

9

| NationalGrid | $88.38 | no amount provided | no amount provided |
|---|---|---|---|
| Day Care | $600 | $650 ($150 per week) | $400 |
| Car insurance | $75.78 | $108.33 ($1300 annual) | no amount provided |
| Cash/entertainment | $100 | $50 | $51.60 cash |
| Meals outside | no amount provided | $86.67 ($20 per week) | $42.54 entertainment |
| Haircuts | no amount provided | $18.33 | no amount provided |
| Holiday/birthday gifts | no amount provided | $70 | no amount provided |
| TOTAL | $3,225.66 | $2,761.33 | $2,878 |

The Debtor offered varying testimony as to the claimed necessity of some of these expenses.

Her older daughter has asthma and younger daughter has a condition called sensory integration dysfunction. *Tr.* 7. As to costs for her younger daughter's condition, she explained that six-month check-ups with a neurologist were recommended and that her daughter did not need to take any special medication, although future therapy may become needed. *Tr.* 7-8; *Letter from Alan B. Silken M.D. regarding Leia Brunell dated November 5, 2004,* Pl.'s Ex. 10. The Debtor also testified that she has an unspecified out-of-pocket state health insurance cost for her and her daughters for which she pays $122 a month. *Tr.* 13.

The Debtor stated that her ex-husband has visits with her daughters for two hours on Wednesday night and every other weekend from Friday to Sunday, and that she has her daughters two weekends a month. *Tr.* 20. The Debtor testified that she tries to do low-cost activities with her children for entertainment, such as renting a movie, getting a pizza or going apple picking. *Id.*

10

The Debtor pays daycare for her twins and also has before and after school expenses for her oldest daughter. For all three children, she testified that the cost of daycare is $200 per week, or $2,400 per month. *Tr.* 21-22. She is not able, however, to pay the entire cost of daycare, and pays $600 per month to the woman who presently takes care of her children. *Id.* She testified that the woman who takes care of her children has been very kind to her, but believes that she will have to pay the difference in costs eventually. *Tr.* 22-23.

The Debtor pays for an internet expense. The expense is part of her children's entertainment and her various personal use, though not specifically required for their school or her work. *Tr.* 34.

The Debtor testified that her children have school expenses, such as school supplies, backpacks, lunch boxes, school pictures and items recommended by their teachers. She testified that she had to spend a "whole bunch," but not every month. She guessed that this amount was $200 to $250 total. *Tr.* 35. The Debtor foresees the school expenses for her children increasing as they get older, for items such as clothes, computers, calculators and notebooks. *Tr.* 36-37. The Debtor testified that she is unable to pay for the expense to have her daughters participate in athletic and other programs, including the $50 cost of a soccer program for her oldest daughter. *Tr.* 35-36.

With respect to her student loans, the Debtor offered no evidence that she has made any payments on the amounts she borrowed, other than a vague recollection that she believed she made some payments prior to returning to graduate school. *Tr.* 17. She did, however, testify that she was aware of the William D. Ford Direct Loan repayment program sponsored by the United States Department of Education ("Ford program"). She testified that she had attempted to enroll

in the program, but had not heard anything regarding the status of her application as of the date of

the trial and had not yet had the chance to call regarding the program. *Tr.* 27-28, 66; *Copy of the*

*Debtor's completed Federal Direct Consolidation Loan application and cover letter to the*

*United States Department of Education dated August 2, 2006*, Pl.'s Ex. 6. ECMC provided the

Debtor with very detailed information regarding the Ford program, together with their request for

the Debtor to consider consolidating her student loan in the Ford program. *Copy of a letter dated*

*June 26, 2006 from counsel for ECMC to counsel for the Debtor*, Def.'s Ex. 2. Under the Ford

program, the Debtor would have four options with respect to the repayment of her loan. *Id.* at 2.

The first three payment options provide for a payment ranging in between $1,133.46 and

$2,266.92. *Id.*

The fourth repayment option, known as the Income Contingent Repayment Plan ("ICR

Plan"), provides for a monthly payment based upon the borrower's annual income, the total

amount borrowed and family size. *Id.* These payments can be as low as zero. *Id.* Since the

payments ordinarily would not be sufficient to cover the amount of interest accruing on the loan,

this amount would be added to the principal balance only until 10% more than the original

principal balance is reached. *Id.* At that point interest would continue to accrue but not be added

to the principal balance. *Id.* Her payment amount for each year would be set based upon the

adjusted gross income filed in her annual return. *Id.* at 3. Upon enrollment in the Ford program,

the Debtor would also become eligible for deferments or forbearance from making payments on

her student loan based upon negative changes to her financial situation. *Id.* at 4. Based on the

Debtor's 2005 income of $28,565, the ICR Plan payment amount would be $153.27. *Id.* at Ex. 1.

Based on a gross income of $35,000 for 2006, her payment would be $260.83 per month. *Id.* at

12

Ex. 4. At the end of the twenty-five year repayment period for the ICR Plan, any remaining balance on the loan would be canceled. *Id.* at 3.

## III. Analysis

### A.    Applicable Law

Under 11 U.S.C. § 523(a)(8), an educational debt is not dischargeable unless the debtor can establish that the repayment of the debt would impose an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8);[7] *Smith v. Educ. Credit Mgmt. Corp. (In re Smith),* 328 B.R. 605, 610 (B.A.P. 1st Cir. 2005). There is no dispute that the debts at issue in the Complaint fall under the purview of 11 U.S.C. § 523(a)(8), the parties having stipulated that the debts are for the student loan currently held by ECMC. *JPTM* 4-5. It is therefore the Debtor's burden to prove by a preponderance of the evidence that excepting the student loan from discharge will cause the her and her dependents undue hardship. *Smith,* 328 B.R. at 611.

Courts have used several tests to evaluate undue hardship claims under 11 U.S.C. § 523(a)(8), including the widely accepted *"Brunner* test" and the "totality of the circumstances" test, which have been examined and described in detail by previous courts. *See Hicks v. Educ.*

---

[7]Section 523(a)(8) was amended with the changes put into effect under the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") on October 17, 2005. Since this case was filed on September 23, 2004 before the effective date of BAPCPA, however, the version of 11 U.S.C. § 523(a)(8) in effect as of that date is applicable. Section 523(a)(8) provided pre-BAPCPA, in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtors dependents . . .

*Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18, 23-25 (Bankr. D. Mass. 2005); *Kopf v. United States Dep't. of Educ. (In re Kopf)*, 245 B.R. 731, 737-41 (Bankr. D. Me. 2000). In the First Circuit, in the absence of controlling authority, courts have been free to choose its own approach in evaluating undue hardship. *Kelly v. Educ. Credit Mgmt. Corp. (In re Kelly)*, 312 B.R. 200, 206 (B.A.P. 1st Cir. 2004); *see also Nash v. Conn. Student Loan Foundation et al. (In re Nash)*, 446 F.3d 188, 190-91 (1st Cir. 2006) (declining to adopt a preferred method for determining undue hardship under 11 U.S.C. § 523(a)(8)). Many courts within the First Circuit have adopted the totality of circumstances test. *See Hicks,* 331 B.R. at 23-24; *Kopf,* 245. B.R. at 739-40. As I stated at trial and have so stated previously, I employ the totality of the circumstances test in evaluating undue hardship claims under 11 U.S.C. § 523(a)(8). *Tr.* 49; *In re Gharavi*, 335 B.R. 492, 497 (Bankr. D. Mass. 2006). In so doing, I will review all relevant factors and circumstances surrounding a particular bankruptcy case. These factors include a debtor's past, present and reasonably reliable future financial resources, and reasonable necessary living expenses. *Id.*; *Kopf,* 245 B.R. at 738, 745-6. As Judge Boroff did in *Hicks*, under the totality of circumstances test, I essentially consider all of the factors relevant to whether the Debtor can maintain herself and her dependents now and into the reasonably foreseeable future while repaying her educational debt. *Hicks*, 331 B.R. at 31.

B.   <u>Debtor's Past, Present and Future Income</u>

The record demonstrates that when the Debtor has sought employment, she has consistently been able to obtain employment. The Debtor was employed continuously from the time she completed her college degree to the time she returned to graduate school in 1993 in increasingly responsible engineering positions. *Tr.* 51-53. Since returning to the workforce in

2004, the Debtor has similarly been continuously and progressively employed in the health

services industry. *Interrogatory Answers*, Pl.'s Ex. 7 at 3-4.

Since August 2004, the Debtor has been employed with three different employers. At the

Attleboro Center from August 2004 to August 2005, the Debtor earned approximately $37,000

annually, or $17.79 per hour. *Tr.* 6. At her position with South Bay Mental Health Services

from August 2005 to November 2005, she earned $30.00 per contact hour. *Interrogatory*

*Answers,* Pl.'s Ex. 7 at 3. With her current employer, Associates, she earned $35,000 annually,

or $16.8269 hourly as of November 1, 2005, when she started the position. *Tr.* 38. The record

established that her year-to-date net pay as of September 2, 2006, including the mileage and gas

reimbursement, as $22,531.80. *Copy of year-to-date earning statement,* Pl.'s Ex. 2; *Tr.* 60-61.

The evidence indicates that the Debtor's current salary is $17.50 per hour. *Letter from Program*

*Director of Associates for Human Services,* Pl.'s Ex. 13; *Year-to-date earning statement*, Pl.'s

Ex. 2 (showing bi-weekly gross pay of $1,399.99 for pay periods since June 29, 2006). Based

upon the steadiness of her past and current employment, I find that it is reasonable to expect that

the Debtor will continue to be steadily employed and advance in her chosen profession into the

future.

As to her current income from employment, the parties arrive at differing figures. ECMC

argues that the Debtor's net monthly income as of September 2, 2006, is $2,816, dividing

$22,531.80 roughly, by the eight months that had passed in 2006 as of that date. *Tr.* 61; *Def'. 's*

*Post Trial Memorandum* at 2. On the other hand, the Debtor argues that the Debtor's monthly

income is merely $2,155.74, apparently the bi-weekly net amount multiplied by two. *Trial Brief*

*of Pl.* at 19. Both are incorrect, as ECMC uses an overinclusive calculation, and the Debtor uses

15

a method which results in an understated monthly net income amount.  *See In re Harden*, 351

B.R. 643, 649 (Bankr. C.D. Ill. 2006) (monthly income computed on two bi-weekly paychecks

understates monthly income).

     The correct calculation must take into account the actual time periods elapsed as of the

time in consideration.  Since September 2, 2006 reflected the end of the 18th bi-weekly pay

period of the year, her average year-to-date net pay at her current job as of that date was

$1,251.77 bi-weekly ($22,531.80 ÷ 18).  Further, since there are fifty-two (52) weeks in a year,

there are twenty-six (26) bi-weekly pay periods in that time, and each month of the year has

2.1667 bi-weekly pay periods (26 ÷ 12).  As a result, the Debtor's true net monthly income as of

September 2, 2006 was $2,712.20 monthly ($1,251.76 x 2.1667).  *Harden*, 351 B.R. at 649

(computing monthly income accurately would be reflected in utilization of 4.3 weekly periods

per month (i.e. 2.1667 bi-weekly pay periods)); *see also Smith*, 328 B.R. at 612 (using figure of

4.3 weeks per month to determine correct amount of monthly income).  I will use the figure of

$2,712.20 as the Debtor's net monthly income.[8]

     Since the parties stipulated that she receives $704 per month in child support for all three

---

[8]Using the Debtor's higher salary of $17.50 per hour does not yield a significant
difference from the above figure, for some reason.  Once the mileage reimbursement is
subtracted, averaged over eighteen weeks, and added back into the new bi-weekly net income
figure, the average bi-weekly net comes to almost the same amount, $2,710.63.

I determine the Debtor's year-to-date mileage reimbursement and new monthly net
income by deducting the net pay without mileage reimbursement from her total net pay as of
September 2, 2006, using the figures provided in Pl.'s Ex. 2: $22,531.80 - ($1,383.84 x .79) -
($1,837.49 x .79) - ($1,077.86 x 11) - ($1,106.78 x 5) = $2,596.59.  This amount, averaged over
eighteen bi-weekly pay periods is $144.26 per bi-weekly pay period ($2,596.59 ÷ 18).  Using the
above figures, the Debtor's new average current bi-weekly pay is $1,106.78 + $144.26 =
$1,251.07.  Her average net monthly pay therefore is approximately $2,710.63 ($1,251.07 x
2.1667).

16

children, I include this amount in her current monthly income. *Tr.* 29.[9]  Besides her mere belief

that her husband's employment history is poor and unreliable, the Debtor provided no evidence

that there has been any interruption in the receipt of this amount. *Id.*  However, because this

amount is attached by the Massachusetts Department of Revenue ("MDOR") from her ex-

husband's pay, I find it reasonable to expect that this amount will continue. *Id.*

Between her current employment and child support, the Debtor's net income per month is

at least $3,416.20 ($2,712.20 + $704).  In addition, the evidence demonstrates that the Debtor

received tax refunds of $4,918 in 2004 and $4,284 in 2005. *Copies of federal tax returns,* Pl.'s

Ex. 3; *Tr.* 23-24. ECMC argues that this amount should be included in the Debtor's income

because she testified that she expects to receive a tax refund next year. *Def.'s Post-Trial*

*Memorandum* at 2-3.  However, I will not reach the question of how much of her tax refund

should be budgeted into her income in this case because the reason for these large tax refunds

was not established, and therefore I am unable to determine how reliable the receipt of refunds

would be continuing into the future.

Assuming for the moment that her expenses are $3,225.66 as indicated in her budget of

August 2006, *see* Pl.'s Ex. 5, the difference from her income of $3,416.20 is $190.54.  ECMC

has offered evidence that establishes that based on the Debtor's 2005 income of $28,565, the ICR

Plan payment amount would be $153.27. Def.'s Ex. 2 at Ex. 1.  Based on a gross income of

---

[9]The divorce judgment and separation agreement provides that her ex-spouse is to pay the
amount of $176 per week. *Judgment of Divorce Nisi and Separation Agreement,* Pl.'s Ex. 12.
Since the parties have stipulated that $704 is the amount that the Debtor receives in child support
each month, I will accept this figure. *JPTM* 4.  However, the correct monthly calculation of $176
weekly would ordinarily result in a monthly figure of $176 x 4.3 = $757, not the $176 x 4 = $704
stipulated by the parties. *See Harden*, 351 B.R. at 649.

$35,000 for 2006, her payment would be $260.83 per month. *Id.* at Ex. 4. Her ICR Plan

payment amount for each year would be set based upon the adjusted gross income filed in her

annual return. *Id.* at 3.   It is evident that the Debtor's income for 2006 may actually be higher

than estimated, and that its amount into the future will continue to increase, thereby increasing

her required minimal payment under the ICR Plan to an amount that exceeds her current

disposable income.   However, just because a debtor's present income may be insufficient to pay

expenses necessary to maintain even a minimal standard of living does not automatically entitle a

debtor to a discharge of their student loans. *See Burkhead v. United States of America and Educ.*

*Credit Mgmt. Corp. (In re Burkhead)*, 304 B.R. 560, 566 (Bankr. D. Mass. 2004); *Bloch v.*

*Windham Prof'l, Suffolk University et al. (In re Bloch)*, 257 B.R. 374, 377-78 (Bankr. D. Mass.

2001).   Rather, a debtor must also demonstrate that a debtor's prospects for increasing future

income are so bleak as to warrant a discharge of student loans. *Smith*, 328 B.R. at 611; *Educ.*

*Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835, 839-40 (B.A.P. 1st Cir 2004);

*Burkhead*, 304 B.R. at 566; *Bourque v. Educ. Credit Mgmt. Corp. (In re Bourque)*, 303 B.R. 548,

550 (Bankr. D. Mass. 2003).   Financial adversity alone is not sufficient to have a student loan

debt discharged on the basis of undue hardship. *Bourque,* 303 B.R. at 550.

While the Debtor's current level of income might not be sufficient to make payments,

based on her employment record and pay increases since just 2004, the evidence demonstrates

that the Debtor's prospects for a steady increase in income over time are promising, which is a

relevant consideration. *Savage*, 311 B.R. at 840.   The Debtor's pay is subject to increase, as

demonstrated by her salary, which has increased each year, since she reentered the workforce in

2004. *See Copies of tax returns for 2003 through 2005,* Pl.'s Ex. 3; *Interrogatory Answers,* Pl.'s

18

Ex. 7 at 3-4. Her pay is also subject to the annual upward adjustments by her organization, which was reported to be 1.5% to 4% annually. *See Letter from Program Director of Associates for Human Services,* Pl.'s Ex. 13. Her ex-spouse is also required to pay to her a percentage of additional amounts for any commissions or bonuses that he may receive. *Judgment of Divorce Nisi and Separation Agreement,* Pl.'s Ex. 12.

Further, the Debtor is bright, well-educated and only 41 years of age, and will have the opportunities to increase her income as her children get older. Courts have not discharged the student loans of debtors who have the reasonable likelihood of future opportunities to increase income, even for debtors who have the responsibility of raising children. *See, e.g., Smith,* 328 B.R. at 612 (reversing findings of lower court which discharged debtors' student loans based on future prospects for an increase in debtors' income as their child got older); *Savage,* 311 B.R. at 840 (reversing findings of lower court which discharged debtor's student loans based on increasing practicality for part-time work or longer hours at job as her son grew older); *Bourque,* 303 B.R. at 550 (finding no reason that the debtor could not work more hours to obtain funds for her student loan payments once her child began school). The Debtor argued that her expenses for her children will only increase. *Tr.* at 36-37. However, the Debtor offered no evidence as to what those additional expenses would be, or why she would not be able to work additional hours as her children grow older. I find that this Debtor does have the reasonable likelihood of such future opportunity for additional pay. Her successful employment in the health services industry since August 2004, and her steady advance in responsibility and pay since that time, makes evident that she uses skills obtained from her education daily, and that her education will continue to serve her well. In further consideration of the Debtor's demonstrated resourcefulness

19

and intelligence, her options of pursuing secondary or higher paying employment, or pursuing

further certification in her field must be considered to be options for her, if not at this time, in the

future, as her children get older.

      C.    <u>Debtor's Reasonably Necessary Expenses</u>

     ECMC does not take issue with the Debtor's expenses, with the exception of questioning

the necessity of the $122 out-of-pocket medical expense for state health care coverage for herself

and her children that the Debtor testified to at trial. *Tr.* 13; *Def.'s Post Trial Memorandum* at 3.

ECMC did not contest the Debtor's estimated $250 total for a one-time school expense.

Averaged over 12 months, at most this comes to an additional $20.83 per month. Since the

Debtor's budget for August 2006 already includes four amounts for medical expenses, doctors

for $25, prescriptions for $20, RiteCare premiums for $61 and NationalGrid for $88.38, I will

assume that the $122 is reflected in these expenses since it has not been shown otherwise. *See*

Pl.'s Ex. 5. As a result, I find that the Debtor has offered that her expenses are currently

approximately $3,246.49.

     The Debtor's expenses are not outrageous or extravagant. However, despite this, she has

not demonstrated that all of her expenses are necessary. A necessary expense is one that the

debtor cannot cut from the budget while maintaining a minimal standard of living. *Smith*, 328

B.R. at 612-13 (citing *Savage*, 311 B.R. at 841). Here, her claimed expenses have fluctuated, in

just the past year, from $2,761 in April 2006 to $3,246.49 in August 2006, a time period during

which her income level did not change. While I do not find that her expenses in any particular

category are necessarily lavish or unreasonable, I do find that she has been able to adjust her

expenses to amounts between $2,761 and $3,246, and provide for herself and her family's

necessary expenses.  Accordingly, I find that it is not unreasonable that the Debtor be required to

cut her expenditures, even if just a bit, to the small extent necessary in order to be able to make

the minimal payments towards her student loan obligations under the ICR plan.  *See, e.g.,*

*Bourque*, 303 B.R. at 551.  Based on the Debtor's 2005 income of $28,565, the ICR Plan

payment amount would be $153.27.  Def.'s Ex. 2 at Ex. 1.  Based on a gross income of $35,000

for 2006, her payment would be $260.83 per month.  Based on a gross income of $38,000, her

estimated monthly payment would be around $300.  Using her current available disposable

income of $190.54, the Debtor would need to cut her expenses by approximately $70 to $110 in

order to be able to make payments on the student loan.  I find that this is a reasonable

requirement in order to be able to manage her student loan obligations and qualify for the

favorable treatment of the ICR Plan.

  D.  <u>Other Relevant Facts or Considerations</u>

   The Debtor has not demonstrated any other unusual medical or other factors which would

militate another conclusion.  Her youngest daughter's check-ups can be conducted every six

months and no medication is required.  *Tr.* 7-8; *Letter from Alan B. Silken M.D. regarding Leia*

*Brunell dated November 5, 2004*, Pl.'s Ex.10.  Her budget otherwise includes amounts for her co-

payments, prescriptions and insurance amounts.  *See* Pl.'s Ex.5.  The Debtor's own health is

good.  *JPTM* 5.

   Also, while she testified to having outstanding bills to pay, the record demonstrates that

the balances on many of these bills were reduced from just April 2006 to August 2006.  *Compare*

*Interrogatory Answers*, Pl.'s Ex. 7 at 7, 11 *with Tr.* 32-33.  This further demonstrates that the

Debtor is resourceful and pays her bills as she is able.  With respect to needed repairs for her car,

21

she testified that she will use her tax refund to pay for that, but obviously any such funds received would and should be available for the reduction of bills as well. *Tr.* 45. The Debtor is also holding $1,000 in her checking account that could and should also go towards her bills if not towards her living expenses. *Tr.* 13-14.

I am not unsympathetic to the Debtor's difficulty in raising three children while working full-time. But because her current income and expenses necessary to provide for herself and her children, with some small adjustments to her expenses, demonstrate that she holds a surplus from which a monthly payment toward her student loan obligations can be made, I do not find that she face an undue hardship should she be required to pay her student loan.[10] In addition, I find that the Debtor's future income prospects also support this finding, as she is bright and well-educated, and will have more opportunities to increase her income as her children get older.

In addition, should something drastic happen in her circumstances, such as child support cease for a period of time, the ICR Plan under the Ford program also allows for forbearance and deferments, and the discharge of any remaining liability should she participate in the plan for 25 years. Def.'s Ex. 2 at 3-4. The Debtor expressed concern about any tax liability for forgiven debt at the end of the repayment period. *Trial Brief of Pl.* at 10. To the extent that the Debtor's situation has not improved to allow for the full repayment of the debt by the end of the repayment

---

[10]The Debtor did not raise a request for the possibility of a partial discharge of the student loan, although ECMC did in its brief, in the event that the Court found fit. *See Def.'s Trial Memorandum* at 41-46. But because bankruptcy courts in the First Circuit have determined that a finding of undue hardship is a prerequisite for granting a partial discharge, I will not consider whether a partial discharge is appropriate in this case since I do not find that the Debtor met her burden of establishing undue hardship. *See Paul v. Educ. Credit Mgmt. Corp. (In re Paul)*, 337 B.R. 730, 738-39 (Bankr. D. Mass. 2006); *In re Lamanna*, 285 B.R. 347, 353 (Bankr. D. R.I. 2002); *In re Coutts*, 263 B.R. 394, 401 (Bankr. D. Mass. 2001).

22

period, the debt will have negatively amortized over time to be many times the amount of the

original principal balance. I conclude that the payment of tax on any gross income imputed to

the Debtor, from any amount of student loan debt forgiven, would impose an undue burden on

the Debtor, and hence be dischargeable. *See Austin v. Educ. Credit Mgmt. Corp. et al. (In re*

*Austin),* No. 03-18868-WCH (Bankr. D. Mass. October 19, 2005). I agree with the several courts

that have found that forecasting the precise amount or existence such a tax liability is speculative.

*See Burton v. Educ. Credit Mgmt. Corp. (In re Burton),* 339 B.R. 856, 889 n.48 (Bankr. E.D. Va.

2006); *Educ. Credit Mgmt. Corp v. Stanley (In re Stanley),* 300 B.R. 813, 818 n.8 (Bankr. N.D.

Fla. 2003). However, I do not need to forecast the exact amount of tax liability to conclude that,

to the extent that the Debtor is obligated under any tax liability as may exist under the tax laws in

effect at that time, the presence of any such liability at the end of one's working life would be a

tremendous undue hardship incurred as the result of the student loan.

Finally, should ECMC not approve her application for the Ford program or provide the

Debtor an alternate affordable payment plan, or subject her wages or tax refunds to garnishment

during the repayment period such that the Debtor is unable to subsist and care for her children, I

would consider another request for discharge of the student loans and review of the Debtor's

situation pursuant to the Debtor's properly renewed request at that time. *See Nash,* 446 F.3d at

194; 11 U.S.C. § 523(b);[11] *Storey v. Nat'l Enter. Sys. (In re Storey),* 312 B.R. 867, 875 (Bankr.

N.D. Ohio) (noting that a decision as to the nondischargeability of a student loan obligation is not

---

[11]Section 523(b) provides, in relevant part: "Notwithstanding subsection (a) of this
section, a debt that was excepted from discharge under subsection (a)(1), (a)(3), or (a)(8) of this
section . . . in a prior case concerning the debtor under this title . . . is dischargeable in a case
under this title unless, by the terms of subsection(a) of this section, such debt is not dischargeable
in the case under this title." 11 U.S.C. § 523(b).

23

res judicata).

**IV.  <u>Conclusion</u>**

      For the reasons set forth herein, I will enter an order granting judgment for ECMC.  To

the extent that the Debtor satisfies the requirements for participation in the Ford program, any tax

liability based on the forgiven balance at that time is discharged.  A separate order will enter.


                                    *William C. Hillman*

                                    _____

                                    William C. Hillman
                                    United States Bankruptcy Judge

Dated: December 8, 2006